E-FILED
Monday, 08 July, 2019  11:53:11 AM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| **GARY HATTER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No. 17-CV-2141** |
| ) | |
| **GLORIA WILLIAMS, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

### ORDER

On September 7, 2018, *pro se* Plaintiff, Gary Hatter, filed his Third Amended Complaint (#85). Defendants are the Housing Authority of Champaign County ("HACC") and three of its employees: Edward Bland, Medra Seals, and Gloria Williams. On December 13, 2018, all four Defendants filed Motions for Summary Judgment (#102, #103, #104, #105). Plaintiff filed Responses (#121, #122, #123, #124) on March 6, 2019, and Defendants filed Replies (#125, #126, #127, #128) on March 19, 2019. For the reasons that follow, all four Motions for Summary Judgment are granted.

### FACTS

Plaintiff's Response fails to comply with Local Rule 7.1(D)(2)(b)(5), in that many of his "facts" are either legal arguments, unsupported by citations to Plaintiff's exhibits, or unsupported by any admissible evidence. Even *pro se* parties must comply with the court's local rules. *Garcia v. Illinois State Police*, 545 F. Supp. 2d 823, 836 (C.D. Ill. 2015).

As a consequence of Plaintiff's lack of compliance with the applicable Local Rules, the following facts are taken largely from Defendants' Statements of Undisputed Material Facts.  Facts are also taken from the exhibits submitted by the parties.

HACC is a housing authority created under 310 Ill. Comp. Stat. 10/3.  One of its functions is administering Housing Choice Vouchers.  In 1993, Plaintiff obtained a Housing Choice Voucher administered by HACC.  He still had a Voucher in 2015.

In 2015, HACC made efforts to ensure the unit size for each tenant was consistent with the needs of that tenant, per a directive from the Department of Housing and Urban Development ("HUD") to "rightsize" units.

In March of 2015, Plaintiff met with a HACC employee, Grace Thomas, to discuss "rightsizing."  Thomas sent Plaintiff a form to use to request a reasonable accommodation during his recertification and rightsizing process.

On May 12, 2015, a different HACC employee, Medra Seals, sent Plaintiff a routine notification to inform him of his scheduled recertification for the voucher program on May 26, 2015.  She also notified Plaintiff that his two-bedroom unit was larger than his one-bedroom voucher size, so he would be required to move, an issue that would be discussed at the May 26, 2015 recertification.

On May 22, 2015, Plaintiff submitted a request for a reasonable accommodation, including verification from his physician referencing Plaintiff's need for additional space to store physical therapy equipment.

Plaintiff did not attend the May 26, 2015 recertification meeting.  On May 26, 2015, Seals sent notice to Plaintiff of a rescheduled recertification meeting for June 22, 2015.  Plaintiff attended the June 22, 2015 meeting.  At the meeting, Plaintiff submitted a verification of income and assets.  Plaintiff claims in his Response that he signed a blank form and that someone at HACC filled it out.  However, in his deposition he stated that his income and asset verification forms for 2010, 2011, 2013, and 2015 were accurate, and he acknowledged his signature on them.  He does not claim the information on the form was inconsistent with information he provided.

Also on June 22, 2015, Plaintiff signed an Authorization for Release of Information.  The Authorization permitted HACC to verify Plaintiff's application information, including "Credit . . . Activity" and "Income and Assets."

On June 23, 2015, the Deputy Director of HACC, Gloria Williams, sought Plaintiff's credit report.  HACC had received information from an anonymous source that it appeared that Plaintiff was not living in the apartment for which he had the voucher.  The credit report revealed a mortgage with CitiFinancial originating on April 19, 2004.  Plaintiff submitted verification of income and asset information in 2010, 2011, 2013, and 2015, but never reported owning any real estate.

On June 24, 2015, Williams requested information from CitiFinancial.  She received a copy of the mortgage for real property located at 701 Crockett, Covington, Indiana ("Covington house"), dated April 19, 2004 and recorded April 22, 2004 by the Fountain County Recorder.

On June 29, 2015, at Williams' direction, Seals notified Plaintiff that his reasonable accommodation request was approved.  Seals also sent a Housing Assistance Payment Contract and Lease Amendment to Plaintiff.

Williams concluded that Plaintiff's Voucher should be terminated for fraud after reviewing and researching his recertification documents, including viewing the property at issue.  On July 13, 2015, at Williams' direction, Seals sent Plaintiff notification that HACC intended to terminate his subsidy assistance due to program fraud and abuse, citing actions that constitute false statements, omissions, or concealment of substantive facts made with intent to deceive or mislead.

On July 22, 2015, Plaintiff requested a review of the proposed termination of his voucher.  An informal hearing occurred on August 3, 2015.  Executive Director Edward Bland acted as the informal hearing officer, and Plaintiff, Seals, and Williams were also present.

At the August 3, 2015 hearing, Plaintiff presented Bland a letter that he wrote.  In the letter, Plaintiff states that he took out a loan for the house in Covington, Indiana on April 19, 2004 only to help his son, and that "[i]n no way" is he "associated with the ownership of this house."  The letter is signed by Plaintiff (and no one else) and dated April 19, 2004.  Plaintiff claims he gave this letter to a HACC employee in 2004.  He remembered nothing about that employee beyond that she was female, and admits that he said nothing about the matter to any other person he subsequently dealt with at HACC.  The letter was not in the HACC files in 2015.  HACC disputes that the

document existed in 2004, contending that no HACC personnel saw the letter prior to July 29, 2015.  Plaintiff states that on July 29, 2015, he took a copy of it to HACC and it was stamped and placed into his file.  Plaintiff contends HACC concealed or destroyed a prior copy of the letter, but he has no evidence to support that contention.

On August 5, 2015, Bland sent correspondence to Plaintiff, including an order upholding the decision to terminate his voucher.  On August 18, 2015, HACC received from Plaintiff a request for a formal hearing.

On August 24, 2015, HACC sent correspondence to Plaintiff informing him that he would be notified by mail of the date and time of a formal hearing.  Two days later, Bland sent correspondence to Plaintiff informing him that HACC had been notified that Plaintiff had initiated the process for filing a fair housing complaint, so the formal hearing would be delayed until the conclusion of an investigation by Amanda Motyka, Equal Opportunity Specialist for HUD.

According to Defendants, in late September, Williams contacted HUD to check on the status of Plaintiff's complaint.  She was advised that Plaintiff did not timely complete the filing of a fair housing complaint and that HACC should proceed with scheduling a formal hearing.  Based on Williams' communications with HUD, a formal hearing was scheduled.[1]

---

[1]Plaintiff stated in his deposition that he first had a phone conversation with HUD in August of 2015, that right after that conversation, HUD sent him a form to fill out, and that he put down in writing "what was done to [him]" and sent it to HUD.  He stated that he sent the information in late November 2015, but later said he sent it on September 14, 2015.  He was still filling out a report with a HUD employee as of

On September 30, 2015, Bland sent correspondence to Plaintiff notifying him of the formal hearing scheduled for October 14, 2015.  The formal hearing occurred on October 14, 2015 with hearing officer Brent Newman, Williams and Seals present. Plaintiff was not there, because he was in Texas getting medical treatment.  He claims that Williams scheduled the hearing knowing he was going to be out of town.

On October 27, 2015, Newman sent correspondence to Plaintiff including an order upholding the termination of Plaintiff's Voucher.  The next day, at Williams' direction, Seals sent correspondence to Plaintiff, including a Termination of Housing Assistance notice, informing Plaintiff that the termination would be effective November 1, 2015.

Documents from the Fountain County, Indiana Recorder concerning the Covington house reflect the following.  A document recorded on August 8, 1997 indicated that on August 6, 1997, Plaintiff and Shelley D. Applegate purchased under contract, as tenants in common, 701 Crockett, Covington, Indiana, from Bonnie Applegate.  A Warranty Deed recorded on January 16, 2004 conveyed title to the property from Bonnie Applegate to Plaintiff and Shelley Applegate as tenants in common.  The Warranty Deed was executed on August 6, 1997.  A Quitclaim Deed dated June 24, 1998 and recorded January 29, 2004 conveyed all interest in the property

_____

November 24, 2015.  On December 2, 2015, HUD sent a letter notifying HACC of the completed filing of a Housing Discrimination Complaint.

from Shelley D. Applegate to Plaintiff.  A Quitclaim Deed executed and recorded on

August 20, 2015 purported to convey Plaintiff's interest in the Indiana property to Gary

L. Hatter, Jr.

ANALYSIS

I.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In ruling on a motion for summary judgment, a district court "has one task and one task

only: to decide, based on the evidence of record, whether there is any material dispute

of fact that requires a trial."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.

1994).  "[T]he district court's function is not to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial."  *Winters*

*v. Fru-Con, Inc.*, 498 F.3d 734, 744 (7th Cir. 2007).  In making this determination, the

court must construe the evidence in the light most favorable to the nonmoving party

and draw all reasonable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a

court's favor toward the nonmoving party does not extend to drawing "[i]nferences that

are supported by only speculation or conjecture."  *Singer*, 593 F.3d at 533, quoting

*Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

"The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, "the nonmoving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

## II.  Defendant's Motion for Summary Judgment

Plaintiff's Third Amended Complaint can be viewed as making claims for racial and disability discrimination, retaliation, and a due process violation. Defendants framed the issues in terms of those categories, and the argument section of Plaintiff's Response likewise addresses each of those types of claims in its own subsection.

### A. *Racial Discrimination*

Employment discrimination case law can be adapted to fit a variety of intentional discrimination claims. See *Grubbs v. Housing Authority of Joliet*, 1997 WL 281297, at *16 (N.D. Ill. May 20, 1997) (applying legal standards from employment discrimination case law to a plaintiff alleging that a housing authority discriminated against him, because of his disability, when he was renting an apartment). The legal standard for determining

whether an employment discrimination claim should survive summary judgment is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Adapting the *Ortiz* standard, the question here is whether the evidence would permit a reasonable factfinder to conclude that Plaintiff's race caused Defendants to take an adverse action against him when administering the voucher program.

In his statement of additional facts, Plaintiff did not include any facts concerning his race or how his race had anything to do with his termination from the voucher program. His argument section does not attempt to tie his race to any of Defendants' actions, either. Instead, his argument in the "Racial Discrimination" section of his Response argues that HACC and Gloria Williams were motivated by a desire to force him to move due to downsizing and budget cuts, so they improperly denied him a reasonable accommodation despite his disability. As Plaintiff argues only a disability discrimination claim in the "Racial Discrimination" section of his analysis, he provides no basis for the court to conclude that his *race* caused an adverse action.

"It is not the Court's responsibility to find arguments, facts, and supporting case law for the parties." *Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *11 (N.D. Ill. July 26, 2016). Plaintiff does not argue how any facts show racial discrimination. He did not put forth any evidence or argument that would permit a reasonable factfinder to conclude that his race caused Defendants to take an adverse action against him. In

the absence of any evidence of racial discrimination or even any argument concerning racial discrimination, all of Defendants' Motions for Summary Judgment are granted as to Plaintiff's racial discrimination claims.

B. *Disability Discrimination*

Defendant argues that he was discriminated against on the basis of his disability when he was denied a reasonable accommodation, terminated from the voucher program, and not reinstated in the program.

"Title II of the ADA and the FHAA prohibit housing discrimination because of a person's disability or handicap." *Dadian v. Village of Wilmette*, 269 F.3d 831, 837 (7th Cir. 2001). "A violation of either act can be established by showing that the plaintiff was a qualified individual with a disability, and the defendant either failed to reasonably accommodate the plaintiff's disability or intentionally discriminated against the plaintiff because of her disability." *Id.* at 838.

Plaintiff was not denied a reasonable accommodation. He was notified in a June 29, 2015 letter that his reasonable accommodation request was approved. So, adapting the *Ortiz* standard to the intentional discrimination issue here, the question is whether the evidence would permit a reasonable factfinder to conclude that Plaintiff's disability caused Defendants to terminate him from the voucher program. See *Ortiz*, 834 F.3d at 765.

The *McDonnell Douglas* burden-shifting analysis remains useful even after *Ortiz*. See *Ferrill v. Oak-Creek Franklin Joint School Dist.*, 860 F.3d 494, 499-500 (7th Cir. 2017). Under *McDonnell Douglas*, as adapted for the circumstances of this case, "a plaintiff can demonstrate a prima facie case of intentional handicap discrimination in the terms and conditions of his apartment rental by showing that he was a member of a protected class, that he was similarly situated to members of the unprotected class, and that he was treated differently than members of the unprotected class." *Grubbs*, 1997 WL 281297, at *16.

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the defendant's action. *McDonnell Douglas*, 411 U.S. at 802; *Ferrill*, 860 F.3d at 500. If the defendant does so, the burden shifts back to the plaintiff to rebut that explanation by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual. *Ferrill*, 860 F.3d at 500. Pretextual "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). It is only necessary to reach the issue of pretext if a plaintiff establishes a prima facie case. *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 744 (7th Cir. 2002).

Plaintiff insists that the Covington house had nothing to do with the termination of his rental assistance, and that he was terminated from the voucher program because of his disability. But that is not what the evidence shows. The evidence shows that

11

Plaintiff was not eligible for rental assistance because he omitted material information from his 2015 recertification documentation in that he failed to disclose his ownership of the Covington house.

At the time of Plaintiff's 2015 recertification, 24 CFR § 982.551(b) required him to "supply any information requested by the PHA or HUD for use in a regularly scheduled reexamination or interim reexamination of family income and composition in accordance with HUD requirements," and it provided that "[a]ny information supplied . . . must be true and complete."  24 CFR § 982.551(b).  And, 24 CFR § 982.551(k) prohibited fraud in connection with the rental assistance programs.  Another subsection, 24 C.F.R. § 982.552(c)(1)(i), provided that the program administrator "may at any time deny program assistance for an applicant, or terminate program assistance for a participant" if the participant "violates any family obligations under the program (see § 982.551)."

A housing authority must obtain, from program participants, information as to the value of the participant's assets in excess of $5,000.  24 C.F.R. § 982.516(a)(2)(ii).  That value is used in calculating the participant's income, which in turn determines eligibility for and the amount of a voucher.  24 C.F.R. § 5.609(b)(3); 24 C.F.R. § 982.4(a); 24 C.F.R. § 5.628(a).

Williams discovered that Plaintiff had a mortgage with CitiFinancial, originating on April 19, 2004, for the Covington house.  He had not disclosed that home on his

recertification papers, even though they asked about whether Plaintiff owned any real estate.  HACC believed that the real estate, with a value of over $5,000, constituted a material omission by Plaintiff, so they terminated his housing voucher.

In the context of the adapted *McDonnell Douglas* test, "a plaintiff can demonstrate a prima facie case of intentional handicap discrimination in the terms and conditions of his apartment rental by showing that he was a member of a protected class, that he was similarly situated to members of the unprotected class, and that he was treated differently than members of the unprotected class." *Grubbs*, 1997 WL 281297, at *16. Plaintiff has failed to identify any similarly situated, non-disabled individuals who were treated differently than he was.  He has not identified anyone who was not disabled, omitted material information in their recertification process, and was not terminated from the voucher program.  This means that he has failed to demonstrate a prima facie case of discrimination, and his disability discrimination claim cannot succeed.

Plaintiff argues that Williams never should have run his credit report in the first place.  However, HACC had received an anonymous tip that Plaintiff was not living in the apartment for which he had a voucher.  The credibility of the tip is bolstered by the fact that Plaintiff admits that he spent weeks at a time in Texas, so someone could have noticed he was not at his apartment for some time.  Most importantly, Plaintiff authorized HACC to obtain his credit report.  Williams properly obtained the credit report pursuant to that authorization form.

Plaintiff also argues that the document he gave to HACC purporting to be from 2004 shows that the Covington house should not have been a problem.  The court disagrees.  HACC could quite reasonably have questioned the origins of the document because it was not in their files, it was not stamped in any way, and it was not signed by anyone other than Plaintiff.  Even assuming the document existed in 2004, it did not authorize Plaintiff to fail to disclose the property on his recertification form.  Plaintiff claims he could not disclose the house because he did not own it, but he clearly did have an interest in it.  While Plaintiff may have taken it out to help his son, the mortgage was solely in Plaintiff's name.  The deed information confirms that the house was owned by Plaintiff and Plaintiff alone at the time of the recertification hearing.  When Plaintiff failed to disclose the fact that he owned a home on his recertification form, HACC properly terminated his voucher for that material omission.

Plaintiff's attempt to justify his omission by claiming that some person told him a decade ago that he could claim not to own the house does not warrant a trial.  The recertification form is not vague.  It asked: "Do you . . . own or have an interest in any real estate[?]"  Regardless of Plaintiff's claimed motives in purchasing the house, Plaintiff clearly had "an interest" in some real estate.  He had a mortgage for it in his name.  He was obligated to provide truthful and complete information to HACC, but he did not do so.  HACC reasonably (and correctly) believed Plaintiff owned a house that he failed to disclose, which gave them every reason to terminate his voucher.

14

C. *Retaliation*

Plaintiff's Response argues that he was retaliated against in violation of Section 818 of the Fair Housing Act.  That Section provides: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806 of this title." 42 U.S.C. § 3617.

 "To prevail on his claims under section 3617, plaintiff must show that (1) he is a protected individual under the FHAA, (2) he was engaged in the exercise or enjoyment of his fair housing rights, or was aiding or encouraging others in the exercise of their rights, (3) defendants were motivated in part by an intent to discriminate, or their conduct produced a disparate impact, and (4) defendants coerced, threatened, intimidated, or interfered with plaintiff on account of his protected activity under the FHAA." *Grubbs v. Housing Authority of Joliet*, 1997 WL 281297, at *25 (N.D. Ill. May 20, 1997).

Plaintiff argues that Williams sent an inspector with a camera in retaliation for him wanting to stay in his apartment.  However, his facts section includes no supported, admissible evidence concerning an inspector.  Again, "[i]t is not the Court's responsibility to find arguments, facts, and supporting case law for the parties." *Sanders*, 2016 WL 4009941, at *11.  Having failed to establish any facts concerning an inspector, there is nothing for the court to consider regarding an inspector.  Plaintiff also argues

15

that Williams retaliated against him for refusing to let the inspector into his apartment, again citing statements and actions that were not included in his statement of facts with specific citations to admissible supporting evidence.

Plaintiff says Williams "retaliated once again by downloading my credit report to try to find a reason to terminate me."  But, Williams was authorized to download the credit report by a form Plaintiff filled out on June 22, 2015, and she had reason to do so because she had heard Plaintiff may not be living in his apartment.  It is also not clear that Plaintiff is alleging the credit report was obtained in retaliation for Plaintiff having exercised a right granted to him by specified sections of the Fair Housing Act, as required as an element of a retaliation claim under 42 U.S.C. § 3617.

Plaintiff stated he reported Williams to "the board" on June 25, 2015, reporting "discrimination, threatening to move and the statement about this program I was on wasn't for single white guys like me, and all the rule violations."  He states that he reported issues to Towanda Macon on August 7, 2015, and he had a fight with Williams about getting copies of documents.  Again, these actions and statements were not included in any statement of facts with specific citations to admissible supporting evidence.

Plaintiff claims that HACC retaliated against him by scheduling a hearing when he was going to be in Texas.  As above, it is also not clear how Plaintiff links this alleged retaliation to his having exercised a right granted to him by specified sections of the Fair Housing Act.  See 42 U.S.C. § 3617.  Further, Williams only scheduled the hearing after

16

speaking with HUD, where someone told her to proceed with scheduling a formal hearing.  While Plaintiff had been in communication with HUD, he was still filling out a report with a HUD employee as of November 24, 2015 and HUD did not send a letter notifying HACC of the completed filing of a Housing Discrimination Complaint until December 2, 2015.  There is no admissible evidence to controvert Williams' reason for scheduling the hearing.  Additionally, Plaintiff claims he could not have known about the hearing, but he stated in his deposition that he had his mail forwarded to Texas in the past.

Lastly, if Plaintiff is arguing he was terminated from the program in retaliation for some protected activity, he does not have the evidence to support his claim.  As discussed above, the evidence shows he was terminated because he owned a house yet he reported in his recertification form that he did not have any interest in any real estate.

D. *Due Process*

Defendants' Motions for Summary Judgment also suggest Plaintiff may be claiming procedural due process violations under 42 U.S.C. § 1983.  Plaintiff's Third Amended Complaint could possibly be read as alleging that rogue actions by HACC employees denied Plaintiff of procedural due process.

"This species of due-process claim is a challenge to the 'random and unauthorized' actions of the state officials in question, i.e., to their unforeseeable misconduct in failing to follow the requirements of existing law." *Michalowicz v. Village*

17

*of Bedford Park*, 528 F.3d 530, 535 (7th Cir. 2008).  "Because such misconduct is inherently unpredictable, the state's obligation under the Due Process Clause is to provide sufficient remedies after its occurrence, rather than to prevent it from happening."  *Id.* "Where state law remedies exist, a plaintiff must either avail herself of the remedies guaranteed by state law or demonstrate that the available remedies are inadequate." *Doherty v. City of Chicago*, 75 F.3d 318, 323 (7th Cir. 1996).

Plaintiff's "claim can stand only if Illinois law provides insufficient remedies for the violation he alleges."  *Michalowicz*, 528 F.3d at 535.  Defendants argued that Illinois law provided sufficient remedies for any violation alleged by Plaintiff.  Plaintiff does not dispute that contention, stating in his Response: "I don't deny that these remedies may have been available under Illinois law had I have known of these remedies."  Nor does Plaintiff argue those remedies were inadequate.  Because Plaintiff agrees that remedies were available under Illinois law, he does not dispute their adequacy, and he did not avail himself of them, his procedural due process claim must fail.  See *Doherty*, 75 F.3d 318, 323.

Plaintiff argues that he did not have to pursue available state remedies because he instead pursued this civil rights lawsuit, and the court had jurisdiction because of his federal claims.  It is true that the court has jurisdiction in this case.  However, as concerns his procedural due process claim, Plaintiff's failure to avail himself of the state law remedies does mean that his due process claim is without merit.  See *Doherty*, 75

18

F.3d at 323 ("Where state law remedies exist, a plaintiff must either avail herself of the remedies guaranteed by state law or demonstrate that the available remedies are inadequate.").

E. *Additional Considerations*

While the court has already concluded that all Defendants are entitled to summary judgment on all of Plaintiff's claims, some Defendants are entitled to summary judgment for additional reasons not yet discussed.

1. Defendant Medra Seals

On April 3, 2019, counsel for Defendants filed a Suggestion of Death of Defendant Medra Seals.

Federal Rule of Civil Procedure 25(a)(1) sets forth the procedure that must be followed when a party to a lawsuit dies:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Here, 90 days have passed and no party has moved for a substitution. The action against Defendant Seals must be dismissed under this Rule.

2.  Defendant HACC

Defendant HACC argues that it is not liable for the actions of its employees.

Under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978),

> . . . a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Plaintiff has not presented any evidence of a HACC policy or custom that violated his rights.  Instead, he testified that HACC employees violated HACC's policies and procedures.  In the absence of any evidence that a HACC policy or custom inflicted any injury, Plaintiff's claims against HACC fail for the additional reason that HACC is not vicariously liable for the actions of its employees.  While the court has concluded the employees did not commit any violations, HACC would not be liable even if they had, providing another reason to grant summary judgment to HACC.

3.  Defendants Seals, HACC, and Bland

Plaintiff testified at page 110 of his deposition that Williams is the only Defendant he believes discriminated against him because of his race, and Williams is the only Defendant he believes discriminated against him because he is disabled.  Thus, Plaintiff's racial and disability discrimination claims do not apply against Defendants Seals, HACC, and Bland.  Those claims cannot succeed against those Defendants where

20

Plaintiff himself conceded that he did not believe those Defendants discriminated against him because of his race or disability, further supporting summary judgment on those claims as to those Defendants.

IT IS THEREFORE ORDERED THAT:

(1)  Defendants' Motions for Summary Judgment (#102, #103, #104, #105) are GRANTED.  Judgment is entered in favor of Defendants and against Plaintiff.

(2)  This case is terminated.

ENTERED this 8th day of July, 2019.

s/COLIN S. BRUCE
U.S. DISTRICT JUDGE